UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| FRANCISCA DURAN, Individually and as the Independent Administrator of the ESTATE OF CONRADO GOMEZ, III<br><br>Plaintiff,<br><br>VS.<br><br>THE CITY OF EAGLE PASS, FERNANDO CHACON, JOSE L. IBARRA, and RICARDO ZEPEDA<br><br>Defendants. | Civil Action No: SA-10-CA-0504-XR |

**ORDER**

On this date, the Court considered the City of Eagle Pass's opposed motion to set aside default judgment (docket no. 14). The Court held an evidentiary hearing on the motion on January 14, 2011. After careful consideration, the Court will grant the motion.

**I. Background**

According to the Complaint, Plaintiff Francisca Duran is the mother of Conrado Gomez, III, a twenty-four-year-old man who committed suicide by hanging himself with a telephone while he was in custody in an Eagle Pass Municipal Jail holding cell. Compl. ¶ 1. On the day of Gomez's death, Gomez arrived home "crying and visibly upset." Compl. ¶ 14. Francisca Duran called 9-1-1 after Gomez threatened to kill himself and suddenly left the house in his car, carrying a gun. Compl. ¶ 14. She told the operator that her son might be a danger to himself. Compl. ¶ 15. Police searched for and found Gomez, and Officers Chacon and Zepeda took Gomez into custody. Gomez told the officers that he hoped the cops "could kill me." *Id.*

1

Officers Chacon and Zepeda brought Gomez to the police station, where he was booked at approximately 5:48 p.m. and placed in a detention cell. Compl. ¶ 16-17. Gomez's clothes, except his underwear, were removed. At approximately 6:15 p.m., Officer Nava observed Gomez trying to strangle himself with his underwear. *Id.* Officer Nava removed Gomez's underwear and left Gomez in the detention cell. *Id.* ¶ 18. About ten minutes later, Officer Chacon went to check on Gomez, and found him hanging from the wall phone with the telephone cord around his neck. Compl. ¶ 18-19. Gomez died as a result. Compl. ¶ 20.

On June 17, 2010, Plaintiff Francisca Duran, individually and as the independent administrator of the Estate of Conrado Gomez, III, filed this lawsuit, asserting claims against Defendants the City of Eagle Pass, Fernando Chacon, Jose L. Ibarra, and Ricardo Zepeda. Plaintiff asserts various due process claims under 42 U.S.C. § 1983, as well as supplemental state-law negligence claims against the City. On June 23, 2010, Plaintiff served the City of Eagle Pass by personally serving Mayor Ramsey English Cantu. *See* TEX. CIV. PRAC. & REM. CODE § 17.024 (an incorporated city may be served by personally serving the mayor). Defendants Chacon, Ibarra, and Zepeda were each personally served with a summons and copy of the Complaint. No Defendant filed a responsive pleading or otherwise appeared. As a result, Plaintiff moved for entry of default, and default was entered on July 27, 2010. *See* docket no. 8.

Plaintiff also moved for default judgment, which was granted in part and denied in part on October 15, 2010. Docket no. 10. With regard to the individual defendants, default judgment was denied because it was not evident from the pleadings that they were being sued in their individual capacities. With regard to Plaintiff's claims against the City of Eagle Pass, the Court denied default judgment on the Eighth Amendment claims, the state-created danger theory of recovery, and the

state-law negligence claims because the claims failed as a matter of law. The Court granted default judgment on the Fourteenth Amendment due process/"special relationship" claims. The Court concluded that Plaintiff's allegations that Officers Chacon, Zepeda, and Nava knew that Gomez was suicidal, yet placed or left him in the detention cell with the obvious risk posed by the telephone and without monitoring was sufficient to demonstrate subjective deliberate indifference, and Plaintiff's allegation that the City failed to train its employees or implement policies and procedures for dealing with suicidal detainees, if true, would amount to objective deliberate indifference to the obvious consequences that constitutional violations to the rights of suicidal detainees would result. The Court therefore entered a partial interlocutory judgment on liability against the City.

On November 3, 2010, before any hearing on damages was held, Attorney Albert Lopez entered an appearance on behalf of all defendants. On November 4, 2010, the individual defendants filed an Answer. On November 5, the City moved to abate the hearing on damages, which was granted. And on November 22, the City filed its motion to set aside the default judgment.

As noted, a hearing was held on January 14, 2011. The evidence before the Court is as follows:

On January 23, 2008, Mary Velasquez, the City Secretary, sent a memo to the City Council, City Manager, Department Heads, City Attorney, and all employees via Department Heads with the subject "Procedure for claims/lawsuit notices." Pl. Ex. 1. The memo includes a written procedure to handle notices of claims or lawsuits "where the City is a party to or where you as an officer or employee were involved as a result of performing actions or work for the City." It provides that, upon receipt, notice of a claim or lawsuit should be immediately forwarded to the City Secretary's Office, which would open a case file and forward the notice to the Insurance Coordinator ("to

forward to TML"), the Finance Director ("to follow up if Insurance Coordinator is not available"), the City Manager ("for information"), the City Attorney ("for information, at this point"), and the affected Department. The Insurance Coordinator would then send the notice/claim to TML and would file the transmittal documents with the City Secretary's Office. TML would then "respond by letting Insurance Coordinator know which attorney has been assigned to represent us or if the case will not be covered." If TML would represent the City, "they take charge of all the case and usually reports to Insurance Coordinator on developments of case." If TML did not provide coverage, it would advise the Insurance Coordinator, who would in turn ask the City Attorney if representation is within their retainer. If not, the Insurance Coordinator would advise the City Manager, who would place the item on the City Council agenda to authorize contracting legal counsel. The memo concluded "[p]lease make sure that any subsequent documentation is filed with the City Secretary's Office in order to have a complete file."

On June 11, 2009, Gomez was detained at the Eagle Pass jail and committed suicide.

On June 16, 2009, Lizette Lopez, the Insurance Coordinator, sent information about the incident to TML, noting that it had a "high potential for a lawsuit" and asking that "TML prepare for any future developments regarding this case." TML assigned a claim number and an adjuster.

Plaintiff sent the City a notice of claim and request for information under the Texas Public Information Act ("PIA") on July 30, 2009. Def. Ex. A. The City Secretary forwarded the notice to the Finance Director/Insurance Coordinator on August 3. Lizette Lopez forwarded the information to TML on August 5. On August 12, 2009, the City, through TML retained attorney Albert Lopez to represent the City and its employees. On August 14, 2009, the City requested an Attorney General opinion regarding whether the litigation exception applied to the request for disclosure. The AG

ruled that the litigation exception did not apply, and the City responded to the PIA request on November 18, 2009.

The City advised Conrado Gomez's father on January 14, 2010 that it was denying his claim for damages.

In April 2010, City Secretary Mary Velasquez noticed that the procedure for handling claims and lawsuits was not being followed thoroughly, which she believed was due to having fairly new employees handling the process. Def. Ex. H (Decl. of Mary Velasquez). She requested a meeting with the City Manager, his Executive Secretary, the Finance Director/Insurance Coordinator (Barrientos), and the Purchasing Agent (Lopez) to clarify the process and avoid any future problems. Gloria Barrientos had designated Lizette Lopez, the purchasing agent, to be the Insurance Coordinator and handle receipt of claims/lawsuits and their transmittal to the TML.[1] They agreed to follow a specific procedure, including: (1) upon receipt of a claim/lawsuit, notice is submitted to the City Secretary's Office to open a case file, and the City Secretary will forward the claim to (a) the Finance Director, who would forward it to TML[2], (b) the City Manager for his information, (c) the Director of the department/staff involved in the incident, and (d) the City Attorney for his information only (if TML rejected coverage, the City Attorney would then handle the case accordingly); (2) after the Insurance Coordinator transmits the claim to TML, the documentation reflecting the transmittal is forwarded to the City Secretary's Office to be filed in the case file; (3) any subsequent correspondence received by any staff member or official regarding the claim is

---

[1] Lopez became the purchasing agent in December 2008, and that is when Barrientos assigned her the duties of insurance coordinator.

[2] The evidence shows that the Finance Director gave the lawsuit to the purchasing agent, who would forward the information to TML by fax.

forwarded to the City Secretary's Office to be filed in the case file, as well as any correspondence received by the Insurance Coordinator. Velasquez stated that all city officials, directors, and employees were made aware of the procedure.

Velasquez and Barrientos admitted that there were no provisions to follow up if a lawsuit was sent to TML or an attorney to make sure that it was received or that an answer had been filed on behalf of the City. Further, even though the City Secretary kept a claim file, they did not keep track of any answer deadlines for lawsuits. Velasquez testified that she had not felt a need to follow up because Lizette Lopez was good at taking care of her part of the process, and she would normally return the transmittal papers to the City Secretary's Office. Barrientos also testified that Lopez was very reliable.

On June 23, 2010, the City of Eagle Pass was served with this lawsuit via personal service on Mayor Ramsey English Cantu. Cantu apparently gave the Complaint to Langley and Banack, and Heriberto Morales, Jr. of Langley and Banack, who was acting as City Attorney, sent it to Mary Velasquez on June 24, 2010. Def. Ex. I(b).

On June 24, 2010, Velasquez sent an email to the Mayor and City Council with a reminder that, if they were ever served with a lawsuit, they should forward it to the City Secretary's Office immediately.

On June 24, 2010, Officers Chacon and Ibarra were personally served. Neither officer provided a copy to the City Secretary's Office. They testified that they did not know that they were supposed to give it to the City Secretary's Office.

On June 25, 2010, Velasquez faxed the Complaint to the Finance Director (Barrientos)'s office. Barrientos did not personally receive a copy of the Complaint, but Lizette Lopez, the

Insurance Coordinator, did. It was Lopez's job as Insurance Coordinator to fax a copy of the Complaint to TML. The Complaint was never faxed to TML, and in fact was later found under a banker's box. As a result, TML was not aware that the lawsuit had been filed, and took no steps to defend the action. Velasquez took no steps to follow up on the lawsuit after forwarding it to Barrientos's office.

On June 30, 2010, Officer Zepeda was personally served. He did not provide a copy to the City Secretary's Office

Lizette Lopez voluntarily resigned on July 23, 2010, for reasons not associated with this lawsuit.

On July 27, 2010, Plaintiff moved for entry of default and for default judgment. The Clerk entered default on July 28, 2010. Docket no. 8. This Court issued a default judgment as to liability against the City on October 5, 2010. The Court indicated that it would set a hearing on damages at a later date.

On November 2, 2010, attorney Lopez was preparing for oral argument in another case when he came across this Court's decision on the motion for default judgment. That night, Lopez reviewed his office file and found no copy of the Complaint. City Secretary Velasquez reviewed her file and found information related to the 2009 notice of claim, but the only document she found relating to the lawsuit was a copy of the transmittal letter that she had sent on June 25, 2010 to the Finance Director's Office. Though Lizette Lopez apparently stated that she had faxed the lawsuit to TML, Velasquez could find no documents indicating that the lawsuit had been faxed. The Court finds that Lopez did not fax the complaint to TML, and the complaint was misplaced under the banker's box, where it was not found until November 3.

On November 3, Attorney Lopez entered an appearance on behalf of the individual officers and the City, and filed an answer on behalf of the individual officers on November 4.

On November 3, Barrientos asked the new purchasing agent to bring her a banker's box containing claims files, and the purchasing agent found the original transmittal letter from Lopez to TML underneath the box. It did not appear that it had ever been faxed to TML.

On November 5, the City moved to abate any hearing on damages until the City could move to vacate the default judgment. After conducting the necessary investigation, the City filed the instant motion to set aside the default judgment on November 22, 2010.

Velasquez and Barrientos both stated that the procedures the City had in place had been effective, and this was the first default judgment taken against the City.

## II. Applicable Standard

Rule 55(c), entitled "Setting Aside a Default or a Default Judgment," provides that "[t]he court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." When, as here, the court has entered a judgment on the default, Rule 60(b) applies. *See In re OCA, Inc.*, 551 F.3d 359, 369 & n.22 (5th Cir. 2008). Rule 60(b) allows a court to grant relief from a judgment under any of six provisions, including "mistake, inadvertence, surprise, or excusable neglect." Rule 60(b) provides that on motion or on just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released or discharged; it is based on an earlier

> judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

FED. R. CIV. P. 60(b). The City argues that the judgment can be set aside pursuant to Rule 60(b)(1) because its failure to answer was due to excusable neglect.

The Fifth Circuit has "directed district courts to consider three factors in determining whether sufficient grounds exist for setting aside a default judgment under Rule 60(b)(1): '(1) the extent of prejudice to the plaintiff; (2) the merits of the defendant's asserted defense; and (3) the culpability of [the] defendant's conduct.'" *Rogers v. Hartford Life & Accident Insurance Co.*, 167 F.3d 933, 938 (5th Cir. 1999) (quoting *Hibernia Nat'l Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1280 (5th Cir. 1985)). "A district court may consider other factors, and the decision of whether to grant relief under Rule 60(b)(1) falls within its sound discretion." *Rogers*, 167 F.3d at 938.

In the past, in considering motions under Rule 60(b)(1), the Fifth Circuit has interpreted Rule 60(b)(1) as incorporating the Rule 55 "good-cause" standard applicable to entries of default. *In re OCA, Inc.*, 551 F.3d 359, 369 (5th Cir. 2008). Under the "good cause" standard, the Fifth Circuit has stated that "[a] willful default is an 'intentional failure' to respond to litigation." *In re OCA*, 551 F.3d at 370 n.32 (citing *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000)). However, the Fifth Circuit has noted that Rule 55(c) was amended in 2007 and "the recent revision to Rule 55(c) may one day cause us to reassess the relationship between the Rule 55(c) good-cause standard and Rule 60(b)(1)." *In re OCA*, 551 F.3d at 369. In a footnote to that statement, the Court said:

> The version of Rule 55(c) effective from August 1, 1987 until December 1, 2007-and in the instant case-stated: "For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in

> accordance with Rule 60(b)." (emphasis added). In dicta, we stated that the word "likewise" made it "certainly reasonable" to interpret "good cause" as applying to the Rule 60(b) default-judgment context. *Kroenke*, 858 F.2d at 1069.
>
> The 2007 amendment to Rule 55(c), which the Advisory Committee "intended to be stylistic only," see Fed.R.Civ.P. 55 (Supp. Note), may alter this analysis. The revision says: "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed.R.Civ.P. 55(c). By deleting the word "likewise," the current version may confirm that the "good-cause" standard applicable to entries of default does not apply to default-judgment cases.

Later, in *In re Marinez*, 589 F.3d 772, 774 (5th Cir. 2009), the Fifth Circuit re-iterated this point, but again declined to decide the question. Thus, the Fifth Circuit has not expressly decided whether the amendments changed its construction of Rule 55(c) such that the "good cause" standard no longer applies to motions to vacate default judgments under Rule 60(b)(1).

Turning to the more general 60(b)(1) standard, the Fifth Circuit has held that "[t]he decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court and will be reversed only for abuse of that discretion." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996). Under Rule 60(b)(1), the district "court may relieve a party ... from a final judgment, order, or proceeding ... [because of] mistake, inadvertence, surprise, or excusable neglect." When determining whether there has been excusable neglect, we review "all relevant circumstances surrounding the party's omission." *Johnson v. Potter*, 364 Fed. App'x 159, 164 (5th Cir. 2010) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). "These circumstances might include (1) 'the danger of prejudice to the [non-movant],' (2) 'the length of the delay and its potential impact on judicial proceedings,' and (3) 'the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'" *Id.*

In addition, the Fifth Circuit has stated that "[s]everal factors shape the framework of the court's consideration of a 60(b) motion," including:

(1) that final judgments should not lightly be disturbed;

(2) that the Rule 60(b) motion is not to be used as a substitute for appeal;

(3) that the rule should be liberally construed in order to do substantial justice;

(4) whether the motion was made within a reasonable time;

(5) whether, if the judgment was a default or a dismissal in which there was no consideration of the merits, the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense;

(6) whether there are any intervening equities that would make it inequitable to grant relief; and

(7) any other factors relevant to the justice of the judgment under attack.

*In re Marinez*, 589 F.3d 772, 776-77 (5th Cir. 2009) (citing *Edward H. Bohlin Co., Inc. v. Banning Co.*, 6 F.3d 350, 356 (5th Cir. 1993)).  Gross carelessness, ignorance of the rules, or ignorance of the law are insufficient bases for 60(b)(1) relief.  However, the Court has instructed district courts to apply Rule 60(b) "more liberally" in the context of default judgments.  *In re OCA*, 551 F.3d at 371 ("Still, 'Rule 60(b) is applied most liberally to judgments of default, since trial on the merits is to be favored over such a truncated proceeding. Unless it appears that no injustice results from the default, relief should be granted.'") (quoting *Azzopardi v. Ocean Drilling & Exploration Co.*, 742 F.2d 890, 895 (5th Cir. 1984)).

Out of an abundance of caution, the Court will consider the motion under both the "good cause" standard and the more general 60(b)(1) standard.

### III. Analysis

The main dispute in the instant case concerns the culpability of the City in the default. If the defendant's default was willful, the court may end the inquiry and deny the motion to vacate the default judgment. Plaintiff does not argue that the City's default was willful. The Court finds that it was not, since there was no evidence of an intentional failure to defend.

Plaintiff relies on *Rogers v. Hartford Life & Accident Insurance Co.*, 167 F.3d 933 (5th Cir. 1999), to argue that the City's motion should be denied because it has failed to demonstrate excusable neglect. In *Rogers*, the Fifth Circuit held that the district court did not abuse its discretion in refusing to set aside a default judgment when Hartford's agent for service of process executed a waiver of service of process, notified Hartford's senior claims officer that the suit had been received, and then forwarded it and the complaint by Airborne Express to Hartford's address of record, but Hartford never received the delivery. The Court stated,

> Hartford never received the suit papers, but Hartford also never attempted to obtain another copy of the complaint. Thus, although Airborne Express never delivered the complaint to Hartford, Hartford's neglect-that is, its failure to establish "minimum internal procedural safeguards"-was at least a partial cause of its failure to respond. Once Hartford's registered agent received the complaint and notified Page, Hartford had a responsibility to ensure that "process ... in fact reached its destination and that action [was] being taken." Hartford, however, did nothing.

*Id.* at 939. The Fifth Circuit held that the district court did not abuse its discretion in finding that Hartford's conduct did not amount to excusable neglect, finding support for the decision in a prior Fifth Circuit case – *Baez v. S.S. Kresge Co.*, 518 F.2d 349 (5th Cir. 1975) – and an Eleventh Circuit case – *Gibbs v. Air Canada*, 810 F.2d 1529 (11th Cir. 1987).

Under these precedents, a district court does not abuse its discretion in denying a motion to vacate a default judgment if the defendant fails to have in place minimum internal procedural

safeguards to prevent default. Plaintiff has a strong argument that the City should have had specific procedures in place to follow up on process that had been received and forwarded. However, the procedures that the City had in place were reasonable – the City Secretary was to forward a copy of the complaint to a number of individuals in addition to the Insurance Coordinator, making the chances of a default slight – and the fact that the Insurance Coordinator left her employment less than a month after failing to forward the complaint likely played a role in the oversight and the failure to follow up. The evidence shows that the City's procedures had worked up until the default in this case, and the City had no reason to doubt that its procedures were adequate until the time the default was discovered. There is absolutely no indication of bad faith on the City's part, and once it learned of the default, it acted quickly to notify the court, investigate the cause of the default, and move to set aside the default.

Further, the decision whether to set aside a default judgment is at bottom an equitable one, and the Supreme Court made clear in *Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 397-99 (1993), that we should take into account all relevant circumstances surrounding the party's omission, including not only the reason for the delay and whether it was within the reasonable control of the movant, but also the danger of prejudice to the other side, the length of the delay and its potential impact on judicial proceedings, and whether the movant acted in good faith. *See also Hibernia Nat'l Bank v. Administracion Central Sociedad*, 776 F.2d 1277, 1280 (5th Cir. 1985) (holding that none of the factors is "talismanic" and that the court may consider other factors, including whether the motion was made within a reasonable time, whether the interests in deciding the case outweighs the interest in the finality of the judgment, whether the public interest is implicated, and the amount of money at stake). Thus, even though the

City's procedures may have been imperfect in hindsight, its culpability is only one factor in the multi-factor inquiry. *Sellers v. Osyka Permian, LLC*, 263 F.R.D. 372, 378 (S.D. Miss. 2009) (recognizing that, had the defendant had in place the required minimum procedural safeguards, it might not have defaulted, but noting that the defendant's culpability is but one factor in the inquiry).

Turning to the issue of prejudice, the Court finds that Plaintiff will suffer no prejudice from granting the motion. A finding of prejudice generally involves more than the inconvenience of actually having to prove one's claims since the preference is for a trial on the merits. *See United States v. Tellez*, 678 F. Supp. 2d 437, 442 (W.D. Tex. 2009). The mere possibility of prejudice from delay is inherent in every case and therefore insufficient by itself to result in denial of a Rule 60(b)(1) motion. *Hibernia*, 776 F.2d at 1280. Further, the Court's power to award attorney's fees as a condition of vacating the default judgment will cure any monetary prejudice to Plaintiff resulting from the default. *See Richardson v. Nassau County*, 184 F.R.D. 497, 503 (E.D.N.Y. 1999) ("[A] district court may impose certain conditions on the parties in conjunction with the granting of a Rule 60(b) motion 'to remedy any prejudice that the non-defaulting party suffered as a result of the default and the granting of the motion.'"); *see also Coon v. Grenier*, 867 F.2d 73, 79 (1st Cir. 1989) (conditioning grant of motion to vacate default judgment on defendant's payment of reasonable costs and fees incurred in securing the entry of default and default judgment); Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2700 at n.5.

Further, the City put on evidence demonstrating the existence of a meritorious defense. In determining whether a meritorious defense exists, "'[t]he underlying concern is ... whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.'" *In re OCA*, 551 F.3d at 373 (concluding that a meritorious defense is presented

when the "factual basis is sufficient in theory to support a conclusion that there is a possibility that the outcome after trial would not mirror the default judgment"). The default judgment was based on two specific allegations in Plaintiff's Complaint: (1) Plaintiff's allegation that Officers Chacon, Zepeda, and Nava knew that Gomez was suicidal, yet placed or left him in the detention cell with the obvious risk posed by the telephone and without monitoring, was sufficient to satisfy the subjective deliberate indifference prong; and (2) Plaintiff's allegation that the City failed to train its employees or implement policies and procedures for dealing with suicidal detainees, if true, would amount to objective deliberate indifference to the obvious consequences that constitutional violations to the rights of suicidal detainees would result. The City presented evidence countering both of these allegations. First, it presented evidence that the telephone in the detention cell had a modified cord that had been represented to be safe for use in the detention cell, thus calling into question whether the telephone posed an obvious risk to Gomez and other suicidal detainees. Second, the City presented evidence that it does train its officers concerning dealing with suicidal detainees. This evidence creates the possibility that the outcome of the suit after a full trial would be contrary to the default judgment. When a meritorious defense is presented, setting aside a default judgment comports with the policy in favor of resolving cases on their merits.

  The Court also considers whether the public interest is implicated and the amount of money at stake. Given that this is a claim against the City of Eagle Pass involving the death of a detainee, significant taxpayer dollars are at stake, and the public interest is certainly implicated. In addition, because the judgment here is interlocutory and not final, concerns about disturbing final judgments and the interest of finality are not at issue, which also weighs in favor of granting the City's motion.

  Considering all of the above, the Court finds that the City has demonstrated "good cause"

and excusable neglect, such that the motion to vacate the interlocutory default judgment should be granted.

## Conclusion

The City's Motion to Set Aside Default Judgment (docket no. 14) is GRANTED, conditioned upon its payment to Plaintiff her reasonable fees and costs incurred in seeking the default and default judgment and in responding to the City's motion to set aside. Plaintiff shall submit an itemized bill of her costs and fees to the City within ten days of this Order. The City shall then either pay the bill as soon as possible or move the Court to review the bill and assess an appropriate award.

The interlocutory default judgment as to liability on Plaintiff's Fourteenth Amendment claim is VACATED.

The City's Motion for Leave to File its Answer and to File a Third-Party Complaint (docket no. 19) is also GRANTED, and the City shall file the Answer and Third-Party Complaint.

It is so ORDERED.

SIGNED this 26th day of January, 2011.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE